IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BLUE MAN PRODUCTIONS, INC.,
:
            Plaintiff,
:
        v.                                    1:05CV02037 (JDB)
:
ERICH TARMANN,
:
            Defendant.
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

Jonathan Hudis
(D.C. Bar No. 418872)
Kathleen Cooney-Porter
(D.C. Bar No. 434526)
OBLON, SPIVAK, McCLELLAND,
  MAIER & NEUSTADT, P.C.
1940 Duke Street
Alexandria, Virginia 22314
(703) 413-3000
Fax: (703) 413-2220
E-Mail: *jhudis@oblon.com*
Attorneys for Plaintiff

Robert W. Clarida
Antonio Borrelli
COWAN, LIEBOWITZ &
  LATMAN, P.C.
1133 Avenue of the Americas
New York, New York 10036-6799
(212) 790-9200
Fax: (212) 575-0671
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

JURISDICTION AND VENUE ..........................................................................3

STANDARD OF REVIEW ..................................................................................3

STATEMENT OF ISSUES ..................................................................................4

STATEMENT OF THE CASE ............................................................................5

1.    Plaintiff's Mark .........................................................................................5

2.    Proceedings Below ...................................................................................13

ARGUMENT .....................................................................................................15

    I.    STANDARDS FOR THE GRANT OF A DEFAULT JUDGMENT .............15

    II.    THE BOARD ERRED IN FINDING NO LIKELIHOOD OF
        CONFUSION ..........................................................................................17

        A.    Plaintiff's Mark Is Extremely Well-Known and is Entitled to a
            Broad Scope of Protection ...............................................................18

            1.    Plaintiff's Mark Has Acquired A High Degree of
                Distinctiveness.........................................................................18

            2.    The Board's Reasons for Discounting or Excluding
                Plaintiff's Evidence of the Strength of Its Mark Are
                Moot or Legally Erroneous.....................................................21

                a.    Board's Rulings As to Certain Evidence Are
                    Moot .................................................................................21

                b.    Board's Legal Conclusions As to Other Evidence
                    Are Erroneous .................................................................22

                    i.    Evidence Featuring the Likeness of
                          Plaintiff's Performers But Not the BLUE
                          MAN GROUP Word Mark ...............................22

                    ii.    Evidence of the Intel Television
                          Commercials......................................................23

                      iii.    Evidence of Limited-Audience
                          Publications ......................................................24

         B.    The Parties' Marks Are Essentially Identical........................................25

            1.    The Dominant Portions of the Marks are Identical ..................25

        C.    The Fact that the Parties' Goods and Services are
             Complementary Favors a Finding of Likely Confusion ......................28

i

D.       As the Newcomer, Defendant Had the Obligation to Avoid
BMPI's Well-Known Mark..................................................................30

III.       THE BOARD ERRED IN FINDING NO DILUTION ....................................32

A.       Standard for Dilution...........................................................................32

B.       The Plaintiff's Mark is Famous...........................................................34

1.       The BLUE MAN GROUP Mark Has Been Advertised
and Publicized Throughout the U.S. Since 1988, Both By
Plaintiff and By Third Parties....................................................34

2.       A Large Amount and Volume of the Plaintiff's Goods
and Services Under the BLUE MAN GROUP Mark
Have Been Sold Throughout the U.S. Since 1988 ...................35

3.       There has been extensive recognition of the BLUE MAN
GROUP Mark by Others ...........................................................35

4.       The BLUE MAN GROUP Mark is Federally Registered.........36

C.       BLUEMAN Dilutes BLUE MAN GROUP ..........................................36

SUMMARY.....................................................................................................................38

CONCLUSION................................................................................................................39

21749/003/803289.1

# Table of Authorities

## CASES

Adkins v. Teseo, 180 F. Supp. 2d 15 (D.D.C. 2001)...............................................16

Al-Kazemi v. General Acceptance & Investment Corp., 633 F. Supp. 540 (D.D.C. 1986)..................................................................................................................16

American Association for Advancement of Science v. Hearst Corp., 498 F. Supp. 244 (D.D.C. 1980).........................................................................................................17

AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979)............................................17, 30

In re Apparel Ventures, Inc., 229 U.S.P.Q. 225 (T.T.A.B. 1986)....................................25, 30

Bongrain International (Am.) Corp. v. Moquet Ltd., 230 U.S.P.Q. 626 (T.T.A.B. 1986)....................................................................................................................30

* Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367 (Fed. Cir. 2002)...............................................................18, 19, 20, 21, 22, 23, 30

Brown v. Weschler, 135 F. Supp. 622 (D.D.C. 1955)............................................................15

Charrette Corp. v. Bowater Communication Papers Inc., 13 U.S.P.Q. 2d 2040 (T.T.A.B. 1989)................................................................................28, 29, 30

China Healthways Institute Inc. v. Wang, 491 F.3d 1337 (Fed. Cir. 2007)............................17

Corp. of Lloyd's of London v. Louis D'Or of France,  Inc., 202 U.S.P.Q. 313 (T.T.A.B. 1979)...........................................................................................................29

Delmatoff, Gerow, Morris, Langhans, Inc. v. Children's Hospital National Medical Ctr., 12 U.S.P.Q. 2d 1136 (D.D.C. 1989) ............................................................17, 18

Dickinson v. Zurko, 527 U.S. 150 (1999) ........................................................................3, 4

Elektra Entertainment Group Inc. v. Crawford, 226 F.R.D. 388 (C.D. Cal. 2005)................16

Faberge, Inc. v. Madison Shirt Corp., 192 U.S.P.Q. 223 (T.T.A.B. 1976) ...........................28

First International Services Corp. v. Chuckles, Inc., 5 U.S.P.Q. 2d 1628 (T.T.A.B. 1988)..................................................................................................................26

iii

Flynn v. Williams Masonry, 233 F.R.D. 176 (D.D.C. 2005) .................................................16

Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565 (Fed. Cir. 1983) ..............18, 25

Hancock  v. American Steel & Wire Co., 203 F.2d 737 (C.C.P.A. 1953) .............................30

House of Hunan, Inc. v. Hunan at Pavilion, 227 U.S.P.Q. 803 (D.D.C. 1985).......................17

Hyatt v. Dudas, 393 F. Supp. 2d 1 (D.D.C. 2005) ....................................................3

Jackson v. Beech, 636 F.2d 831 (D.C. Cir. 1980) ....................................................16

Jockey International, Inc. v. Butler, 3 U.S.P.Q. 2d 1607 (T.T.A.B. 1987) ............................18

Kenner Parker Toys Inc. v. Rose Art Industries Inc., 963 F.2d 350 (Fed. Cir. 1992).............19

King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400 (CCPA 1974)......................17

In re Lamson Oil Co., 6 U.S.P.Q. 2d 1041 (T.T.A.B. 1987)...................................27

Material Supply International, Inc. v. Sunmatch Industrial Co. Ltd., 146 F.3d 983
    (D.C. Cir. 1998)...................................................................4

McDonald's Corp. v. McClaine, 37 U.S.P.Q. 2d 1274 (T.T.A.B. 1995)................................29

McDonald's Corp. v. McKinley, 13 U.S.P.Q. 2d 1895 (T.T.A.B. 1989) ..............................30

Mobil Oil Corp. v. Pegasus Petroleum, 818 F.2d 254 (2d Cir. 1987) ....................................22

Moseley v. V. Secret Catalogue, Inc., 537 U.S. 418 (2003)....................................34

* NASDAQ Stock Market Inc. v. Antarctica S.r.l., 69  U.S.P.Q. 2d 1718
    (TTAB 2004)......................................................33, 34, 37

National Football League  v. Jasper Alliance Corp., 16 U.S.P.Q. 2d 1212 (T.T.A.B.
    1990)................................................................28

Planters Nut & Chocolate Co. v. Crown Nut Co., 305 F.2d 916 (C.C.P.A. 1962) ..........27, 31

Pro-Football, Inc. v. Harjo, 284 F. Supp. 2d 96 (D.D.C. 2003) ................................3

R.J. Reynolds Tobacco Co. v. R. Seelig & Hille, 201 U.S.P.Q. 856 (T.T.A.B. 1978) ..........18

Ralston Purina Co. v. Old Ranchers Canning Co., 199 U.S.P.Q. 125 (T.T.A.B. 1978) .........18

iv

Recot Inc. v. M.C. Becton, 214 F.3d 1322 (Fed. Cir. 2000) ..................................................19

Specialty Brands, Inc. v. Coffee Bean Distributings, Inc., 748 F.2d 669 (Fed. Cir. 1984)..........................................................................................................19, 30, 31

TCPIP Holding Co. v. Haar Communications Inc., 244 F.3d 88 (2d Cir. 2001) ...................18

West Corp. v. McKee Foods Corp., 53 U.S.P.Q. 2d 1910 (T.T.A.B. 2000) ..........................27

In re White Swan, Ltd., 8 U.S.P.Q. 2d 1534 (T.T.A.B. 1988) ...............................................27

## STATUTES

37 C.F.R. §§ 2.120(j)(1), (j)(3)(i), (j)(4) and (j)(5) ...............................................................14

37 C.F.R. §§ 2.122(d)(2), (e) ..................................................................................................14

37 C.F.R. § 2.123(a)(1) and (h) ..............................................................................................14

37 C.F.R. §§ 2.125 and 2.125(c)(1).........................................................................................14

37 C.F.R. § 2.128 .....................................................................................................................14

HR Rep. No. 109-23 (2005) .....................................................................................................34

Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125 (c)....................................32, 33

15 U.S.C. § 1063.........................................................................................................................3

15 U.S.C. § 1063(a) .................................................................................................................32

15 U.S.C. § 1071(b).............................................................................................................3, 14

15 U.S.C. § 1071(b)(4) ..............................................................................................................3

15 U.S.C. § 1125.............................................................................................14, 32, 33, 34, 36, 37

## MISCELLANEOUS

Rule 54(d)(2), Fed. R. Civ. P. .................................................................................................16

Rule 55(b), Fed. R. Civ. P. ...................................................................................................1, 16

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §11:73 (4th ed. 2002) ...............................................................................19, 25, 26, 28, 38

v

## PRELIMINARY STATEMENT

This is a motion for judgment by default pursuant to Rule 55(b), Fed.R.Civ.P.,
following Defendant's failure to answer Plaintiff's Complaint and appeal from an adverse
decision of the Trademark Trial and Appeal Board in an opposition proceeding. Plaintiff
Blue Man Productions, Inc. ("Plaintiff" or "BMPI") owns several Federal trademark
registrations for the famous BLUE MAN GROUP mark ("Plaintiff's Mark") covering a wide
range of goods and services.[1]  Through extensive sales, advertising and promotion since the
1980s, Plaintiff has built up enormous goodwill in the Mark, so that today, the Mark is
nationally famous for the Plaintiff's goods and services.

On August 6, 2001, Defendant Erich Tarmann ("Defendant") filed Application Serial
Number 76/295,724 ("Defendant's Application") to register the BLUEMAN mark
("Defendant's Mark") for "tobacco, smokers' articles, namely, cigarettes." On December 3,
2002, BMPI timely opposed registration of Defendant's BLUEMAN Mark, asserting
trademark priority in, likelihood of confusion with, and dilution of the BLUE MAN GROUP
Mark as the grounds for the opposition. Because Defendant applied to register its virtually
identical BLUEMAN mark for goods that are targeted to the same general class of
purchasers as are Plaintiff's goods and services sold under the BLUE MAN GROUP mark,[2]
the relevant purchasing public is likely to believe that Defendant's BLUEMAN goods and
services originate with BMPI or are somehow sponsored, endorsed, approved by, or

---

[1]    A complete list of Plaintiff's registrations for the BLUE MAN GROUP Mark is set forth
infra at Section 1 (STATEMENT OF THE CASE).

[2]    The Board found, and it is not disputed, that the "class of consumers for the parties'
goods and services must be considered, in part, to be the same, in that both may be marketed to
and purchased by adult members of the general public. This factor favors opposer." Decision at
1821.

affiliated with, BMPI and its famous BLUE MAN GROUP Mark.  In the alternative,

Plaintiff asserted that Defendant's registration of the BLUEMAN mark for its tobacco

products will dilute the distinctiveness of Plaintiff's famous BLUE MAN GROUP mark.

The Trademark Trial and Appeal Board (the "Board" or "TTAB") dismissed

Plaintiff's opposition on August 18, 2005.  The Board's decision ("Decision")[3] was in error

and should be reversed.  The Decision was based on a misreading of the factual record and

upon incorrect conclusions of law.  BMPI's evidence submitted with this motion includes

further substantial additional evidence that was not considered by the Board below, including

the accompanying Declaration and Exhibits of Matt Goldman ("Goldman Dec."), a founding

member of Plaintiff, testifying to advertising and sales figures and numerous other facts not

of record before the Board.  The new evidence here also includes all of the documentary

evidence annexed as Exhibits B and C to the Goldman Declaration. The Exhibit B evidence,

comprising examples of media coverage concerning Plaintiff, further establishes the fame of

the BLUE MAN GROUP Mark, and the Exhibit C evidence, an unsolicited email

communication received by Plaintiff from a consumer, memorializes an instance in which a

BLUE MAN GROUP customer was actually confused as to the source of cigarettes that were

not produced by, affiliated with, sponsored by, or approved for sale by Plaintiff.

The totality of the evidence submitted to this Court clearly establishes the fame of

Plaintiff's BLUE MAN GROUP Mark, the virtual identity of Defendant's BLUEMAN mark to

Plaintiff's Mark with respect to appearance, sound,  meaning, and overall commercial

impression, that the parties' respective goods and services all are targeted for sale to the same

---

[3]        The Decision is reported at 75 U.S.P.Q. 2d 1811 (T.T.A.B. 2005); all citations herein are
to that edition.

2

general class of purchasers, and that relevant consumers are likely to be confused as to

Plaintiff's affiliation with or sponsorship of tobacco products promoted and sold under the mark

BLUEMAN.  Plaintiff's case on the merits is strong, and defendant has knowingly and

resolutely refused to participate in this action.  This Court should therefore grant the instant

motion for a default judgment, reverse the Board's Decision, and remand with instructions that

the Board sustain BMPI's Opposition.

## JURISDICTION AND VENUE

This is a motion for the entry of default judgment in a civil action for review of a final

decision by the Board in Opposition No. 91/154,055 (the "Opposition"), which arose under

Section 13 of the Lanham Act, 15 U.S.C. § 1063. This Court has subject matter jurisdiction over

this matter pursuant to Section 21(b) of the Lanham Act, 15 U.S.C. § 1071(b).  This Court has

jurisdiction over the disposition of Defendant's Application, and venue is proper in this Court,

pursuant to Section 21(b)(4) of the Lanham Act, 15 U.S.C. § 1071(b)(4).

## STANDARD OF REVIEW

In assessing the strength of Plaintiff's claim for purposes of granting the default, this

Court reviews the Board's previous factual findings under a "substantial evidence" standard,

Pro-Football, Inc. v. Harjo, 284 F. Supp. 2d 96, 102 (D.D.C. 2003),  which "requires a

stricter judicial review of agency fact-finding than the 'arbitrary, capricious' approach" and

"involves an examination of the record as a whole, taking into account evidence that both

justifies and detracts from an agency's decision." Id.  at 116.  Further, where the parties

choose to present additional evidence," as does Plaintiff here, the district court should "make

de novo factual findings" based upon the newly submitted materials of record.  Hyatt v.

Dudas, 393 F. Supp. 2d 1, 13 n.12 (D.D.C. 2005), rev'd on other grounds, 492 F.3d 1365

3

(Fed. Cir. 2007).  As the Supreme Court has stated, "[t]he presence of such new or different evidence makes a fact finder of the district judge."  Dickinson v. Zurko, 527 U.S. 150, 164, 119 S. Ct. 1816, 1824 (1999).  Because Plaintiff has submitted substantial new evidence in support of this motion, specifically including the Goldman Declaration and Exhibits B and C attached thereto, the Court must make de novo findings of fact in light of this newly submitted evidence.[4]  The Board's conclusions of law are reviewed de novo. Material Supply Int'l, Inc. v. Sunmatch Industrial Co. Ltd., 146 F.3d 983, 990 (D.C. Cir. 1998)("the district court upon remand should review the decision of the TTAB based upon a true de novo standard, as it would any question of law").

## STATEMENT OF ISSUES

(1) Whether a default judgment should be granted, awarding Plaintiff the relief sought in its Complaint.

(2) Whether the Board erred in holding that the BLUEMAN mark that Defendant applied to federally register does not so closely resemble Plaintiff's BLUE MAN GROUP mark as to cause a likelihood of confusion such that the public is likely to believe that Defendant's BLUEMAN tobacco products have their origin with Plaintiff and/or that such goods are approved, endorsed, or sponsored by BMPI, or are affiliated  in some way with Plaintiff.

(3) Whether the Board erred in holding that the BLUEMAN mark that Defendant applied to federally register does not so closely resemble Plaintiff's BLUE MAN GROUP mark that, when applied to Defendant's goods, will dilute the distinctive quality of the BLUE

---

[4]    The evidence annexed to the Goldman Declaration as Exhibit A was submitted to Board below, but the Board refused to consider much of it for reasons that are now moot in this proceeding, see infra at Sec. II.A.2.

MAN GROUP mark, which became famous and was distinctive prior to Defendant's claimed first use date.

**STATEMENT OF THE CASE**

**1. Plaintiff's Mark**

Since early 1988, Plaintiff has made continuous and extensive use of the mark BLUE MAN GROUP throughout the United States for entertainment services and related merchandise. Goldman Declaration ("Goldman Dec.") at ¶¶ 20-26 and Exhibits A and B. As a result of Plaintiff's efforts, the Board found that Plaintiff's Mark had become widely known, "strong and distinctive" (Decision at 1819), and BMPI contends that its Mark has developed enormous commercial goodwill. Goldman Dec. at ¶ 2.

The relevant facts concerning Plaintiff's BLUE MAN GROUP Mark are more fully set forth in the accompanying Declaration of Matt Goldman. BMPI owns the following federal registrations and pending application for the BLUE MAN GROUP mark:

| Mark | Reg. No. / App. No. | Reg. Date / Filing Date | Goods/Services |
|---|---|---|---|
| BLUE MAN GROUP | 2,450,660 | 5/15/01 | Entertainment services in the nature of live musical and theatrical performances |
| BLUE MAN GROUP | 2,438,222 | 3/27/01 | Gift items, namely, decorative magnets; paper goods, namely, postcards and posters; apparel, namely, hats, t-shirts, sweatshirts |
| BLUE MAN GROUP | 2,617,550 | 9/10/02 | Musical sound recordings |
| BLUE MAN GROUP | 2,677,610 | 1/21/03 | Mugs |
| BLUE MAN GROUP | 2,680,625 | 1/28/03 | Watches, ornamental pins |
| BLUE MAN GROUP | 2,677,611 | 1/21/03 | Clothing, namely, jackets, caps |
| BLUE MAN | 2,741,259 | 7/29/03 | Pre-recorded video cassettes and |

| Mark | Reg. No. / App. No. | Reg. Date / Filing Date | Goods/Services |
|---|---|---|---|
| GROUP | | | discs featuring musical and theatrical performances |
| BLUE MAN GROUP | 3,030,215 | 12/13/05 | Keychains made of metal; mousepads; clocks; stickers; pens; souvenir programs concerning musical and theatrical performances; notecards; non-metal keychains; clothing, namely, tank tops, hats, sweat bands; novelty toys, namely, battery operated balls that glow |
| BLUE MAN GROUP | 77/176,871 (based on use in commerce) | 5/9/07 | Mints; calendars; blank journal books; arts and crafts paint kits; arts and crafts kits comprising colored pencils and pads; business card cases; wallets; luggage tags; tote bags; cosmetics bags, sold empty; key cases; pocket mirrors; pajamas; yoga suits for men and women; long sleeved shirts; t-shirts for children; cloth patches for clothing |

Goldman Dec. ¶ 4, Exh. D.  Defendant, in the Opposition below and in view of his default

before this Court, has not challenged the validity or subsistence of the above-mentioned

marks and registrations.

Plaintiff's Mark is among the most famous in the field of live theatrical entertainment.

Since the 1980s, Plaintiff has sold goods and services totaling more than $1 billion under the

BLUE MAN GROUP mark. (Goldman Dec. at ¶ 2). Since 1998, it has sold more than 11

million theater tickets in the U.S., and continues to sell them at a rate of twenty thousand per

week. (Goldman Dec. at ¶ 5).  Its Las Vegas production alone, now running at a specially-

built theater at the Venetian Resort Hotel Casino, generates more than $4 million each month

in ticket sales, more than $50 million annually.  (Goldman Dec. ¶ 7).  In addition, Plaintiff

has sold approximately 630,000 copies of its Grammy-nominated sound recordings

6

(Goldman Dec. at ¶ 18), 250,000 copies of its live DVD video (Goldman Dec. at ¶ 20), and

has appeared as a featured performer on nationally popular television broadcasts including:

> NBC A Closer Look (1991) – Goldman Dec. Exh. A ("Exh. A"), DVD 3.
>
> Live With Regis & Kathie Lee (1992) – Exh. A, DVD 3.
>
> The Tonight Show with Jay Leno (appearances in 1992, 1993, 1994, 1997, 1999, 2000 and 2003) – Exh. A, DVD 2.
>
> Entertainment Tonight (11/93) – Exh. A, DVD 3.
>
> The Simpsons (5/20/01) – Exh. A, DVD 4.
>
> CBS Sunday Morning (5/20/01) – Exh. A, DVD 3.
>
> The Drew Carey Show (11/14/01) – Exh. A, DVD 6.
>
> The Today Show (4/22/03) – Exh. A, DVD 8.

Plaintiff was invited to perform and did perform live on the internationally-telecast

program on February 21, 2001 at which the 2000 Grammy Awards were presented.

Goldman Dec., Exh. A, DVD 3.  The broadcast attracted a worldwide audience of 1.5 billion

viewers. Goldman Dec. at ¶ 17.

In addition to its long-running theatrical shows described above, Plaintiff also has

presented two touring shows in connection with the mark BLUE MAN GROUP.  The tours

have visited dozens of small, mid-size and large cities throughout the United States.

Goldman Dec. at ¶ 8.

Plaintiff's first touring show, "The Complex," in 2003, satirized and commented upon

stereotypical behaviors of musicians and audiences at rock concerts.  The show includes a

humorous segment in which the on-stage performers make gestures with cigarette lighters,

intended as a reference to a common means by which audience members demonstrate their

approval at certain types of concerts. Goldman Dec. at ¶ 9.

Last year, Plaintiff launched its second touring show, "How to be a Megastar 2.0," which has grossed over $34 million to date as it travels through the United States. It will continue through 2008.  Goldman Dec. at ¶ 10.

For over ten years, Plaintiff has operated a web site located at www.blueman.com ("Plaintiff's Web Site"), which prominently features the BLUE MAN GROUP Mark. Plaintiff's Web Site provides information about Plaintiff's goods offered and services rendered in connection with the mark BLUE MAN GROUP, offers interactive features of interest to Plaintiff's fans, and serves as a retail seller of merchandise bearing Plaintiff's mark BLUE MAN GROUP.  Goldman Dec. at ¶¶ 11-12. Plaintiff's Web Site attracts approximately 200,000 unique visitors per month. Goldman Dec. at ¶ 13.

Plaintiff has sold merchandise in the United States under the mark BLUE MAN GROUP for about 15 years.  Plaintiff now offers a wide variety of merchandise under its mark BLUE MAN GROUP, including apparel, bags, luggage, wallets, business card holders, mousepads, magnets, pocket mirrors, pens, paper goods including posters and souvenir programs, mugs, pre-recorded musical sound recordings and DVDs featuring theatrical performances, jewelry including keychains and watches, toys, pet accessories, cameras, umbrellas, arts and craft kits, foam hands, skateboards, nightlights, message wands and novelties. Goldman Dec. at ¶ 14.  Plaintiff's merchandise is sold principally through Plaintiff's Web Site and at venues where Plaintiff's theatrical or touring shows appear. Goldman Dec. at ¶ 15.

Expenditures for television advertisements featuring the Plaintiff's performances under the BLUE MAN GROUP Mark, in connection with the sale of Intel computer chips,

8

have exceeded $550 million.  (Goldman Dec. at ¶ 28).[5]  Such advertisements have appeared

on such popular television programs as <u>Super Bowl XXXIV</u>, <u>Friends</u>, <u>The X-Files</u>, and <u>The

Drew Carey Show</u>.  (Goldman Dec. at ¶ 32).  Beginning in 2006, the mark BLUE MAN

GROUP also was featured in an advertising campaign for a specially-created BLUE MAN

GROUP line of Swatch brand wristwatches.  Total sales of these wristwatches to date are

approximately 30,000 units.  Goldman Dec. at ¶ 33.

Plaintiff and its Goods and Services also have been prominently featured in numerous

nationally circulated media articles since 1988, including the following early examples:

1988:  <u>Details</u> (feature w/photo) Exh. A, doc. 556

1989:  <u>Details</u> (feature w/photo) Exh. A, doc. 557
        <u>Village Voice</u> (feature w/photo) Exh. A, doc. 558
        <u>New York</u> magazine (feature w/photo) Exh. A, doc. 559

1990:  <u>Show Business</u> (front page, feature w/photo) Exh. A, doc. 564

1991:  <u>Village Voice</u> (feature w/photo) Exh. A, doc. 544
        <u>New York Times</u> (featured review w/photo) Exh. A, doc. 545
        <u>American Way</u> magazine (feature w/photo, "Blue-Man Fandom") Exh. A, doc. 546
        <u>Vanity Fair</u> (feature w/photo) Exh. A, doc. 547
        <u>New York Times</u> (review of arts festival at Lincoln Center) Exh. A, doc. 548
        <u>New York Times</u> (Sunday "Arts & Leisure" feature w/photo) Exh. A, docs. 68-69
        <u>New York</u> magazine (feature w/photo) Exh. A, doc. 552
        <u>Theater Week</u> (cover photo and feature story) Exh. A, doc. 551
        Frank Rich, WQXR Radio (review) Exh. A, doc. 553
        <u>Stagebill</u> (Lincoln Center "Serious Fun" arts festival) Exh. A, docs. 465-489
        <u>New Yorker</u> magazine (review) Exh. A, doc. 550

1992:  <u>The Nation</u> magazine (featured review) Exh. A, doc. 530

---

[5]     The advertisements, for Intel computer chips in the Pentium 3 and Pentium 4 series, were
produced with the active creative involvement of Plaintiff, and five of the seven commercials
were based on ideas that originated with Plaintiff. Goldman Dec. at ¶ 29. All ads featured the
Plaintiff's BLUE MAN GROUP mark, shown on-screen in the Plaintiff's customary color and
typeface, See Goldman Dec. Exh. A, DVD 1, and thus, as described in <u>Fortune Small Business</u>,
"they come across as ads almost as much for Blue Man as for the chipmaker." (Goldman Dec. at
¶ 30, Exh. A, docs. 61-64, <u>Fortune Small Business</u> at 56.)

<u>Time</u> magazine (feature w/photo) Exh. A, doc. 531
<u>Esquire</u> magazine (feature w/photo) Exh. A, doc. 532
<u>Variety</u> (featured review) Exh. A, doc. 533
<u>New York Daily News</u> (celebrity page, feature w/photo, describing how Plaintiff
        "leaped onto the world stage") Exh. A, doc. 535
<u>Playboy</u> magazine (review) Exh. A, doc. 536
<u>People</u> magazine (feature w/photos) Exh. A, docs. 538-540
<u>Business Week</u> (article w/photo) Exh. A, doc. 541
<u>ARTnews</u> (cover story w/photo) Exh. A, doc. 19
<u>New Yorker</u> magazine (review w/caricature of Plaintiff) Exh. A, doc. 550

1993:  <u>GQ</u> magazine (feature w/photo) Exh. A, doc. 519
       <u>Creem</u> magazine (feature w/photo) Exh. A, docs. 520-522
       <u>Four Seasons Hotels & Resorts</u> magazine (feature w/photo, describes "plenty of
                exposure on the Tonight Show, Live With Regis & Kathie Lee, and Charles
                Kuralt's Sunday Morning") Exh. A, doc. 523-526
       <u>American</u> in-flight magazine (describing Plaintiff as "among the most celebrated"
                Off-Broadway productions") Exh. A, doc. 527
       <u>New York Times</u> (Sunday "Arts & Leisure" feature w/photos) Exh. A, doc. 528

In addition to the above representative sample of the early and extensive press and

media coverage which Plaintiff generated and continues to generate, Plaintiff has been

featured as an answer in the <u>New York Times</u> Sunday Crossword puzzle (Exh. A, doc. 516,

June 30, 1996), included as an answer to a question on the television game show <u>Jeopardy!</u>

(Goldman Dec. at ¶ 36), featured as an icon of New York City – together with the Statue of

Liberty and Times Square -- in the tourist card game "New York City Visions" (Exh. A,

docs. 514-515, 1996), profiled in <u>Fortune Small Business</u> for its development of "Brand

Blue" (Exh. A, docs. 61-64, March 2003), featured as a halftime performer at New York

Knicks NBA basketball games in Madison Square Garden (Goldman Dec. at ¶ 36), and

written into the storyline of the network television series <u>Arrested Development</u>, which

featured a running subplot about one of the characters trying to join Plaintiff as a performer.

(Goldman Dec. at ¶ 36).

Accordingly, Plaintiff has been recognized frequently as "a certified pop culture phenomenon" (Exh. A, doc. 314, Panorama at 32, June 11, 2001), a "household name" (Exh. A, doc. 353 Calvin Spark at 17), "world-famous" (Exh. A, doc. 295, Official City Guide at 68, Dec. 6, 2001), "international celebrities" (Exh. A, doc. 280, New York magazine, Mar. 25, 2002), and "blue icons" (Exh. A, doc. 75, New York Times, Sept. 16, 2001).   Plaintiff also has drawn criticism for this very success, labeled an "empire" that is "the McDonald's of the music world" (Exh. A, doc. 492, The Week, Aug. 1, 2003) and attacked for "franchising the operation like Starbuck's" (Exh. A, doc. 499, Shout, April 2002).[6]

The success of Plaintiff's performances and related merchandise under the BLUE MAN GROUP Mark is derived in large part from its multigenerational appeal, which has led to the recent opening of its latest theatrical show in June 2007 at the Sharp Aquos Theatre at the Universal Studios resort in Orlando, Florida. Goldman Dec. ¶ 6.  Any perceived connection or affiliation with cigarettes or other tobacco products would be inconsistent with the commercial impression which Plaintiff  has consistently created under its BLUE MAN GROUP Mark.   Much to Plaintiff's alarm, such confusion already has occurred. Annexed as Exhibit C to the Goldman Declaration is an unsolicited email received by Plaintiff on December 12, 2003.  This email, the full text of which is set forth below, demonstrates unequivocally that a relevant consumer can readily believe that Plaintiff is connected or associated with the sale of cigarettes:

"Subject: Blue Man in Mexico City

---

[6]    These documents are not introduced for the truth of the quoted statements, but merely as evidence that such statements have been made often and by a broad range of sources.

Hi my name is Sonia Vargas I live in Monterrey México, and I have been a fan of yours since I saw you [sic] show in New York City on a family vacation.

I'm sorry to say that the reason I'm writing is not very pleasant, because on the 28th of October [2003] I was invited to one of the biggest parties of the year on a place called "El Marco" museum of art, this party was hosted by a Cigarette brand called Kent, every thing was grate [sic] until I saw that there was going to be a show by the "Blue Man show", but the show consisted of blue men inviting the people at the party to try out this new brand (Kent), I must say that was very shocking for me, because instead of being happy to watch your show again, it was very disappointing, the act was terrible, and had nothing to do with the one I saw in NY, in fact the only thing this show had in common with the one in NY was that there were 3 men painted in blue.

But that isn't the worst part, the bad show could be because you were tired or something, but the fact that you were representing a tobacco brand was terrible, because I once red [sic] on the internet that you were against tobacco consumption, so you can understand my shock.

I hope you can write and give me some kind of explanation for this terrible performance, and if you could tell me how much truth was the thing I read on the internet about how you were against tobacco consumption, because if so I don't understand why you could be at this party.

I am sending some pictures I scanned from magazines here in México called CARAS y QUIEN,[7] so you can identify the party because I know you do like millions of shows a year, so you may not even remember what party I'm referring to.

Thanks for your attention, and I hope to hear from you soon.

Sonia"

The evidence here of record demonstrates that Plaintiff's Mark is extremely well-known throughout the nation, and that confusion as to Plaintiff's connection with the sale of cigarettes is not only likely, but indeed already has occurred.

---

[7]    The photographs attached to the email are also included with Exhibit C to the Goldman Declaration.

21749/003/803289.1

**2. Proceedings Below**

On August 6, 2001, Defendant filed Application Serial Number 76/295,724 ("Defendant's Application") to register the BLUEMAN mark for "tobacco, smokers' articles, namely, cigarettes." The Application claims a date of first use of March 6, 2000, twelve years <u>after</u> Plaintiff's first use. (Decision at 1812, n.1). The Application was published for opposition in the *Official Gazette of the U.S. Patent and Trademark Office* on August 20, 2002. <u>See</u> TARR record[8] on USPTO website.

On December 3, 2002, BMPI timely opposed Defendant's Application on the grounds of (1) priority and likelihood of confusion, and (2) priority and dilution. TTABVUE record[9] on USPTO website, Doc. #1. Defendant answered the Opposition, denying the salient allegations thereof. TTABVUE record on USPTO website, Doc. #4.

During its trial testimony before the Board, BMPI submitted: (1) the trial testimony of Laura Camien, marketing director of Plaintiff, taken on July 15, 2004, and exhibits thereto; (2) a Notice of Reliance dated January 21, 2004 with a certified copy of BMPI's federal registrations for the BLUE MAN GROUP Mark; (3) a Notice of Reliance dated January 21, 2004, which contained newspaper and magazine articles, videotapes, and promotional materials, showing that Plaintiff's Mark and the goods and services bearing or connected to the same have been the subject of numerous articles and broadcasts in publicly-circulated

---

[8]    The TARR record may be accessed by entering Defendant's Application Serial Number, "76295724" at http://tarr.uspto.gov/.

[9]    The TTABVUE record may be accessed by entering the Opposition Number, "91154055" at http://ttabvue.uspto.gov/ttabvue/.

13

media. TTABVUE record on USPTO website, Docs. #7 and 8.[10]  Defendant submitted no

trial testimony and did not file a Brief on Final Hearing before the Board. (Decision at 1815).

On August 18, 2005, the TTAB issued its Decision dismissing Plaintiff's Opposition.

The Board held that Plaintiff's Mark was "strong and distinctive" (Decision at 1819) and that

the "class of consumers for the parties' goods and services must be considered, in part, to be

the same, in that both may be marketed to and purchase by adult members of the general

public." (Decision at 1821).  Both of the factors were held to weigh in favor of a finding of

likelihood of confusion. The Board also held that the parties' marks, BLUE MAN GROUP

and BLUEMAN, were very similar in sound and appearance. (Decision at 1820).  Despite

these findings, the Board concluded that there was no likelihood of confusion.  As to

Plaintiff's dilution claim, the Board held that the BLUE MAN GROUP mark was not

sufficiently "famous" by the relevant date of August 6, 2001 to qualify for dilution protection

under 15 U.S.C. § 1125(c)(1).[11]

Plaintiff timely filed this appeal under Section 21(b) of the Lanham Act, 15 U.S.C.

§ 1071(b), on October 17, 2005 (Complaint, Court Docket No. 1). On January 18, 2006, after

other less-cumbersome attempts at valid service had failed, BMPI moved for the issuance of

---

[10]    A Notice of Reliance is a means for submitting self-authenticating documentary evidence
without the need for a deposition, see 37 C.F.R. §§ 2.120(j)(1), (j)(3)(i), (j)(4), (j)(5) and
2.122(d)(2), (e). All trial testimony before the Board is by means of submitted deposition
transcripts. 37 C.F.R. §§ 2.123(a)(1), (h), 2.125.  There is no live testimony.  The parties'
summary of the evidentiary record and legal arguments to the Board is by means of submitted
Briefs on Final Hearing.  37 C.F.R. § 2.128.

[11]    The Board found, and it is not here disputed, that the relevant date for Defendant
Tarmann's commencement of use under 15 U.S.C. § 1125(c)(1) is August 6, 2001. As the Board
explained, Decision at 1822, because Defendant did not submit any evidence of use of the
BLUEMAN mark in the U.S., the proper date is the filing date of Defendant's application, not
the claimed (but unsubstantiated) date of first use.  This is relevant only to the dilution claim and
has no bearing on the likelihood of confusion claim.

14

Letters Rogatory in order to affect extraterritorial service of process on Defendant, a resident

of Austria (Court Docket No. 3). This Court granted that motion on January 20, 2006 (Court

Docket No. 4). The Letters Rogatory and BMPI's Summons and Complaint (all translated

into Defendant's native language) were duly served on December 4, 2006, through

Diplomatic Channels (Court Docket No. 11).

On December 20, 2006, Defendant contacted the Court by letter to request additional

time in which to answer the Complaint in this action (Court Docket No. 9). The Court

granted that request, setting a deadline of February 20, 2007, for Defendant to file an Answer

(Court Docket No. 8). Defendant failed to file an Answer by that deadline, has not yet done

so, and has not had any further communication with Plaintiff or this Court to the knowledge

of Plaintiff's counsel.

On May 29, 2007, BMPI filed a Declaration with the Court noting Defendant's failure

to timely respond to the Complaint (Court Docket No. 12). On May 30, 2007, the Clerk of

the Court entered a default against Defendant for his failure to timely answer the Complaint

(Court Docket No. 13). By Minute Order issued on August 21, 2007, the Court set a

deadline of September 6, 2007, by which Plaintiff's instant motion for a default judgment

was to be filed. This motion is timely filed prior to that deadline.

**ARGUMENT**

## I.  STANDARDS FOR THE GRANT OF A DEFAULT JUDGMENT

When a defendant fails to answer, the entry of a default judgment is a matter within the

sound discretion of the district court. <u>Brown v. Weschler</u>, 135 F. Supp. 622 (D.D.C. 1955).

Here, Defendant's failure to answer the Complaint, even after the Court specifically granted

Defendant's request for an extension of the time in which to do so, and his failure to respond

15

after the entry of default by the Clerk of the Court, warrant the entry of a default judgment pursuant to Rule 55(b), Fed.R.Civ.P.   Defendant's refusal to respond in this action, following his prior refusal to submit briefs or testimony before the Board, has effectively obviated the appropriate adjudication of this matter through the judicial process.  Jackson v. Beech, 636 F.2d 831, 835-36 (D.C. Cir. 1980) (default judgment proper "when the adversarial process has been halted because of an essentially unresponsive party"); see also Elektra Entertainment Group Inc. v. Crawford, 226 F.R.D. 388 (C.D. Cal. 2005)(default properly entered where defendant did not answer for more than six months after receipt of service, and more than four months after entry of default by clerk)(copyright infringement action).

A default judgment "establishes the defaulting party's liability for the well-pled allegations in the complaint." Flynn v. Williams Masonry, 233 F.R.D. 176, 177 (D.D.C. 2005), citing Adkins v. Teseo, 180 F. Supp. 2d 15, 17 (D.D.C. 2001); see also Al-Kazemi v. General Acceptance & Inv. Corp., 633 F. Supp. 540, 542 (D.D.C. 1986)("[u]pon a party's default, the well-pleaded allegations of the complaint related to liability are taken as true"). Defendant here has not objected to the relief demanded in the Complaint's Prayer for Relief, i.e., that the decision below be reversed (Complaint, Prayer at ¶ 1), that Defendant's application to register the mark BLUEMAN be denied registration (Complaint, Prayer at ¶ 2) and that Defendant pay to Plaintiff the costs of this action (Complaint, Prayer, ¶ 3).[12]

---

[12]    If the Court grants this motion for default judgment, Plaintiff will timely submit its Bill of Costs pursuant to Rule 54(d)(2)(B), Fed.R.Civ.P.

21749/003/803289.1

## II.  THE BOARD ERRED IN FINDING NO LIKELIHOOD OF CONFUSION

Plaintiff's case on the merits of the underlying dispute is strong, including its claims of priority, likelihood of confusion and dilution.[13]

Likelihood of confusion is ultimately a question of law.  China Healthways Inst. Inc. v. Wang, 491 F.3d 1337, 1339 (Fed. Cir. 2007) (reversing Board's dismissal of trademark opposition).  Here, as in China Healthways, the likelihood of confusion between Defendant's BLUEMAN mark and Plaintiff's BLUE MAN GROUP Mark under Lanham Act Section 2(d), 15 U.S.C. §1052, is amply demonstrated by the evidence of record. The Board erred in holding otherwise.  In determining likelihood of confusion, factors considered by this Court may include: the strength or fame of a mark; the similarity of the marks; the similarity of the goods and services, trade channels, and purchasers; and any intent to trade upon another's goodwill.  Delmatoff, Gerow, Morris, Langhans, Inc. v. Children's Hospital National Medical Ctr., 12 U.S.P.Q.2d  1136, 1139 n.9 (D.D.C. 1989).[14]  Because Plaintiff's BLUE MAN GROUP Mark is extremely well-known, Defendant's BLUEMAN mark is very

---

[13]      No issue of trademark priority exists. The Board found (Decision at 1816), and it is not disputed, that Plaintiff's BLUE MAN GROUP Mark enjoys priority by virtue of its trademark registrations made of record.  King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 1401 (CCPA 1974).

[14]      Delmatoff cites an eight-factor list of possible factors drawn from the Ninth Circuit decision in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), while other decisions from this Court have drawn from Second and Seventh Circuit opinions as to the relevant factors. American Ass'n for Advancement of Science v. Hearst Corp., 498 F. Supp. 244, 259 (D.D.C. 1980)(applying Seventh Circuit factors); House of Hunan, Inc. v. Hunan at Pavilion, 227 U.S.P.Q. 803, 807 (D.D.C. 1985)(applying Second Circuit factors). Our research does not reveal any decision by the D.C. Circuit as to the preferred articulation of the confusion factors, although Plaintiff contends that a likelihood of confusion between BLUE MAN GROUP and BLUEMAN is evident under any applicable standard.

17

similar to Plaintiff's Mark, and the parties' goods and services are marketed to the same

general class of purchasers, the Board erred in failing to sustain the Opposition.[15]

A.    Plaintiff's Mark Is Extremely Well-Known and is Entitled
to a Broad Scope of Protection

1.    Plaintiff's Mark Has Acquired A High Degree of Distinctiveness

Marks that have acquired a high degree of distinctiveness, such as Plaintiff's Mark, are

afforded a broad scope of protection.  See, e.g., Bose Corp. v. QSC Audio Prods. Inc., 293 F.3d

1367, 1373, 1376 (Fed. Cir. 2002) (ACOUSTIC WAVE and WAVE for electronic audio

products so famous that defendant precluded from using POWERWAVE for amplifiers, with

the Federal Circuit noting the "voluminous evidence of nationwide critical notice" of plaintiff's

marks).  As the Board itself noted in R.J. Reynolds Tobacco Co. v. R. Seelig & Hille, 201

U.S.P.Q. 856, 860 (T.T.A.B. 1978):

> [I]t is well recognized that the law today rewards a famous or well
> known mark with a larger cloak of protection than in the case of a
> lesser known mark because of the tendency of the consuming public to
> associate a relatively unknown mark with one to which they have long
> been exposed if the mark bears any resemblance thereto.

---

[15]    While actual confusion evidence is a factor that may be considered in assessing
likelihood of confusion, Delmatoff, supra, such evidence is not necessary for a finding of likely
confusion, see, e.g., Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1571 (Fed.
Cir. 1983) ("[I]t is unnecessary to show actual confusion in establishing likelihood of
confusion.").  Moreover, where, as here, a Defendant has made scant actual use of its mark, this
factor has no evidentiary value in the likelihood of confusion analysis.  See, e.g., TCPIP Holding
Co. v. Haar Communications Inc., 244 F.3d 88, 102 (2d Cir. 2001) ("[B]ecause [defendant] has
not yet launched its portal in a serious way, there has been little or no opportunity for actual
confusion to be manifested.  As a result, the absence of evidence of actual confusion sheds no
light whatever on the problem [of determining likelihood of confusion]"); Jockey Int'l, Inc. v.
Butler, 3 U.S.P.Q.2d 1607, 1612-13 (T.T.A.B. 1987) (absence of actual confusion is of no
consequence where Defendant's sales were insignificant); Ralston Purina Co. v. Old Ranchers
Canning Co., 199 U.S.P.Q. 125, 128 (T.T.A.B. 1978) (minimal use of mark lessens chance of
actual confusion coming to light).

See also Recot Inc. v. M.C. Becton, 214 F.3d 1322, 1327 (Fed. Cir. 2000) ("The fame of a trademark may affect the likelihood purchasers will be confused inasmuch as less care may be taken in purchasing a product under a famous name.") (quoting Specialty Brands, Inc. v. Coffee Bean Distribs., Inc., 748 F.2d 669, 675 (Fed. Cir. 1984)); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §11:73, at 11-149 (4th ed. 2002) (hereafter "McCarthy") ("[T]he rationale is that the more distinctive, unique and well-known the mark, the deeper is the impression it creates upon the public's consciousness and the greater the scope of protection to which it is entitled.")

The broad scope of protection afforded to famous marks was highlighted by the Federal Circuit Court of Appeals in Kenner Parker Toys Inc. v. Rose Art Industries Inc., 963 F.2d 350, 354 (Fed. Cir. 1992) (FUNDOUGH confusingly similar to PLAY-DOH for modeling compounds). In Kenner Parker Toys, the Court noted that "fame of the prior mark[] plays a dominant role in cases featuring a famous or strong mark." Id. at 352; accord Bose, 293 F.3d at 1371, 63 U.S.P.Q.2d at 1305; Recot, 214 F.3d. at 1328, 54 U.S.P.Q.2d at 1898. The Court further noted: "a mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark" and "the Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark." Kenner Parker Toys, 963 F.2d at 353. The strength of a mark is "usually the same as its economic and marketing strength." 2 McCarthy, supra §11:73, at 11-149.

As detailed above, Plaintiff's BLUE MAN GROUP Mark has gained tremendous strength as evidenced by two decades of use, the more than $1 billion in goods and services that have been sold under the Mark, Plaintiff's own $75 million expenditure for advertising its goods and services, the certified gold-selling, Grammy-nominated sound recordings and

19

double-platinum-selling DVDs sold bearing the Mark, the more than $550 million worth of television advertising bearing the Mark that appeared in connection with the sales of Intel computer chips, numerous featured appearances on <u>The Tonight Show with Jay Leno</u> beginning in 1992 and continuing through to the present, featured appearances on other successful national television programs including an appearance before 1.5 billion viewers on the 2001 <u>Grammy Awards</u> telecast, feature articles and cover stories in national and international publications including <u>Time</u>, <u>People</u>, and <u>The New York Times</u>, and the plethora of other references in the press. Although the number of such media references has continued to grow rapidly over time, many of the examples just cited precede the operative date by which Plaintiff must show fame for dilution purposes, August 6, 2001. Decision at 1822.

Indeed, Plaintiff's showing of strength is fully equal to, if not greater than, the showing made by Bose for its ACOUSTIC WAVE mark in <u>Bose Corp. v. QSC Audio Products</u>, 293 F.3d 1367, 1373, 1376 (Fed. Cir. 2002). In <u>Bose</u>, plaintiff's advertising expenditures for ACOUTIC WAVE were $5 million (<u>id.</u>, at 1372); here, BLUE MAN GROUP's own advertising expenditures are more than $75 million, $20 million of which was prior to 2001. Goldman Dec. at ¶ 24. In <u>Bose</u>, annual sales were $50 million; here Plaintiff's annual sales of theatre tickets alone, in its Las Vegas location alone, are over $50 million. Goldman Dec. at ¶ 7. Like the plaintiff in <u>Bose</u>, BMPI features its mark on its products and in its advertising, advertises in nationwide publications, and has received reviews in a "wide variety of magazines" and "popular daily press in major cities." <u>Bose</u> at 1372; cf. Goldman Dec., Exh. A and Exh. B. Further, Plaintiff here has had enormous exposure on popular nationwide television programs such as <u>The Tonight Show with Jay Leno</u> and the <u>Grammy Awards</u>, which

far exceeds any exposure of record in the <u>Bose</u> case.  In short, under the <u>Bose</u> standard, BLUE MAN GROUP is a famous mark.

Moreover, Defendant cited <u>no</u> evidence of third-party registration or use, nor any other evidence that could even arguably rebut the overwhelming demonstration of the acquired strength of Plaintiff's Mark.

The strength factor therefore weighs heavily in favor of finding likelihood of confusion.  Indeed, even the Board itself concluded that the BLUE MAN GROUP Mark is "strong and distinctive" (Decision at 1819), and that the strength factor "favors opposer," <u>id.</u>, despite refusing to consider a great deal of Plaintiff's evidence.  In light of that evidence, now properly before this Court, and in light of the new evidence presented here in the Goldman Declaration, and its Annexed Exhibits, the strength of the Mark cannot properly be deemed any less than "famous."

  2. <u>The Board's Reasons for Discounting or Excluding Plaintiff's Evidence of the Strength of Its Mark Are Moot or Legally Erroneous</u>

The Board excluded or greatly discounted much of Plaintiff's proffered evidence as to the strength of the BLUE MAN GROUP mark.  Its reasons for having done so are either moot in this proceeding, in view of the new evidentiary record submitted here by Plaintiff, or are legally unsound.  In either event, the Board's refusal to consider or credit Plaintiff's evidence as to strength should be reversed.

  a. <u>Board's Rulings As to Certain Evidence Are Moot</u>

The Board excluded Plaintiff's proffered evidence of foreign-language media coverage, press releases that did not appear in printed publications, articles that did not indicate their source, and documents that were not authenticated by witness testimony or

21

affidavit. No such materials are included in the exhibits submitted with this motion, thus the Board's objections below to such evidence are now moot.

        b.    <u>Board's Legal Conclusions As to Other Evidence Are Erroneous</u>

The Board also rejected or discounted the probative value of much of Plaintiff's other evidence submitted below, often in a cursory, conclusory fashion without citation to authority. This was error, and this Court should give the following categories of evidence greater weight than did the Board.

        i.    Evidence Featuring the Likeness of Plaintiff's
            Performers But Not the BLUE MAN GROUP Word
            Mark

Without citing authority, the Board rejected numerous printed and audiovisual exhibits submitted below because they only feature the likeness of Plaintiff's performers and do not incorporate the word mark BLUE MAN GROUP. <u>See, e.g.</u>, Decision at 1817 (television appearances on "The Simpsons" and "Early Today"); <u>id.</u> at 1814 (various magazine covers and articles). The Board neglected to recognize the probative value of such evidence under the doctrine of picture/word equivalence, whereby a visual image and a corresponding word mark are deemed equivalent for trademark purposes. See, e.g., <u>Mobil Oil Corp. v. Pegasus Petroleum</u>, 818 F.2d 254, 257 (2d Cir. 1987)(plaintiff's "flying horse" logo design held infringed by defendant's use of word mark PEGASUS). By definition, if an image can constitute an infringing use of a word mark, as it does in <u>Mobil Oil</u>, it can also be evidence of the strength of a word mark, as the Federal Circuit recognized in <u>Bose Corp. v. QSC Audio</u>, 293 F.3d 1367 (Fed. Cir. 2002) when it cited published <u>photographs</u> of the Bose ACOUSTIC WAVE radio as evidence of the fame of the word mark ACOUSTIC WAVE. <u>Id.</u> at 1373.

The same reasoning applies here. Every appearance of the BLUE MAN GROUP performers on "The Simpsons" or in a <u>New York Times</u> photo feature contributes to the fame of the BLUE MAN GROUP word mark, certainly at least as much as a photograph of a radio promotes the words ACOUSTIC WAVE in the <u>Bose</u> case. Accordingly, the Board erred in dismissing this evidence.

ii.    Evidence of the Intel Television Commercials

For the same reason, the Board erred in discounting the seven nationally-broadcast television commercials for Intel computer chips. Again without citing authority, the Board simply opined that the ads were not probative of strength because "the words BLUE MAN GROUP appear in relatively small letters in a corner of the screen for just a few seconds." Decision at 1817. Notwithstanding that "the performers are <u>prominently featured</u>," <u>id.</u> (emphasis added), the Board found the advertisements of little probative value. This was error.

The advertisements are, <u>inter alia</u>, BLUE MAN GROUP performances, seen by millions of television viewers on the <u>Super Bowl</u>, <u>Friends</u>, the <u>X-Files</u>, and other national broadcasts. Moreover, the BLUE MAN GROUP word mark, in the Plaintiff's own distinctive coloring and typography, appears on screen in each ad. See Goldman Dec. Exh. A, DVD 1. If these performances were part of the entertainment content of these same programs, giving Plaintiff exposure to exactly the same viewers, there can be no doubt that the televised performances would be viewed as highly probative; indeed, the Board considered Plaintiff's many performances on the <u>Tonight Show</u> to be just that. Decision at 1818.

23

For the Board to distinguish between entertainment content and advertising in this way is contrary to well-established case law, which looks only for "evidence that the public has been exposed frequently and nationwide." <u>Bose</u>, <u>supra</u>, at 1374. The fact that the "exposure" occurs in an advertising context rather than an entertainment context is simply not relevant, nor has the Board ever previously suggested such a distinction.

Nor is it relevant that Intel computer chips, and not Plaintiff's performances, are the product ostensibly being promoted by the ads. The ads' ultimate mission of promoting Intel products does not preclude the ads from promoting Plaintiff simultaneously. For purposes of establishing the fame of a mark, what matters is "exposure" and the Plaintiff's exposure through the Intel ads is at least as great as the exposure for Intel itself.  If Intel's $550 million advertising expenditure for this campaign cannot be credited toward establishing the fame of Plaintiff's Mark through increased  "exposure" of performances under Plaintiff's Mark, it should not be credited toward Intel's benefit either.  The annexed exhibits demonstrate empirically that Plaintiff is on screen longer and makes a more vivid commercial impression in the advertisements than does Intel. The Board's restrictive either/or interpretation of the Intel advertisements was in error.

iii.    Evidence of Limited-Audience Publications

The Board also erred in dismissing the significance of the many references to Plaintiff in publications targeted to a specialized readership.  Taken individually, features concerning Plaintiff in magazines like "Ad Age," "Fortune Small Business," "American Cemetery," "Brandweek," "The Calvin Spark: The Magazine for Alumni and Friends of Calvin College," and  "DVD Works: The Art and Science of DVD Production" may  not evince the fame of the BLUE MAN GROUP Mark, but collectively these media features speak volumes.

24

The sheer number and diversity of publications demonstrates that Americans from all walks of life, from advertisers and investors to cemetery administrators and media producers, have been "exposed frequently and nationwide" to Plaintiff's Mark.  Similarly, the long list of regional publications that have featured Plaintiff, from Pittsburgh PA to Savannah GA to San Diego CA (none of which have ever been the site of one of Plaintiff's theatrical shows), establishes in the aggregate that "the public has been exposed frequently and nationwide." Bose, supra, at 1374.  The Board erred in concluding otherwise.

      B.     The Parties' Marks Are Essentially Identical

          1.     The Dominant Portions of the Marks are Identical

It is well settled that "one feature of a mark may be more significant than other features, and that it is proper to give greater force and effect to that dominant feature."  Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570-71 (Fed. Cir. 1983); See also, 3 McCarthy § 23.44 (if the "dominant portion of both marks is the same, then confusion may be likely, notwithstanding peripheral differences").   In this case, the entirety of Defendant's mark BLUEMAN is identical to the dominant portion of BMPI's mark BLUE MAN GROUP. When two marks share the same dominant element, a long line of cases has found that the marks are confusingly similar and, therefore, evidence that confusion is likely.  See, e.g., Giant Food, 710 F.2d at 1570-71, 218 U.S.P.Q. at 395 (noting that the dominant portion of both Defendant's GIANT HAMBURGERS mark and Plaintiff's GIANT FOOD, SUPER GIANT, GIANT FOOD & Design, and GIANT & Design marks was the word GIANT and concluding that confusion was likely because the marks were similar in appearance, sound and overall commercial impression); In re Apparel Ventures, Inc., 229 U.S.P.Q. 225, 226 (T.T.A.B. 1986) ("'SPARKS' is the dominant portion of Defendant's mark and it is all of the registered mark.

In light of this fact, and contrary to Defendant's contentions, the marks create similar commercial impressions.  They are similar in meaning, sound and appearance.").

By the Board's own case law precedent, a side-by-side dissection of differences between marks is not the appropriate test to determine confusing similarity.  See, e.g., First Int'l Servs. Corp. v. Chuckles, Inc., 5 U.S.P.Q.2d 1628, 1632 (T.T.A.B. 1988).  Rather, the "focus must be on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks."  Id.  Because of the striking similarities of appearance, sound, meaning, and overall commercial impression, both as to the dominant portions of the marks and the marks in their entireties, Defendant's BLUEMAN mark is confusingly similar to Plaintiff's BLUE MAN GROUP mark.  Coupled with the fame of Plaintiff's mark entitling it to a broad scope of protection, the confusing similarity of marks factor weighs in favor of finding a likelihood of confusion.

The Board's contrary conclusion is erroneous. The Board conceded that "the marks are very similar in appearance and pronunciation, differing essentially only in that opposer's mark has the additional word GROUP, and depicts BLUE MAN as two words rather than one." Decision at 1820.  The Board ignored these similarities to conclude, again without citation to authority or to the record, that the similarity factor favored Applicant.  The Board impermissibly split the parties' marks into their components to reach this result, failing to consider the marks in their entireties.  This was error. See 3 McCarthy § 23:41 and cases cited therein.

To justify its result, the Board asserted that Plaintiff's Mark has a "connotation" that Defendant's mark lacks, namely "the connotation of the appearance of [Plaintiff's] performers." Decision at 1820.   The Board did so without explanation, substituting its improper subjective view of discrete parts of the record for a proper objective examination of the evidentiary record

26

as a whole – particularly the strength of the BLUE MAN GROUP mark and a comparison of the parties' marks in their entireties.

Further, even if the Board were correct in its unsupported claim that the connotations of the parties' marks are different, the result should still favor Plaintiff.   Again according to the Board's own case law precedent, confusing similarity of any <u>one</u> of appearance, sound, meaning or commercial impression is sufficient to support a finding of confusing similarity between the marks.  <u>In re Lamson Oil Co.</u>, 6 U.S.P.Q. 2d 1041, 1042 at n.4 (T.T.A.B. 1987); <u>In re White Swan, Ltd.</u>, 8 U.S.P.Q.2d 1534, 1535 (T.T.A.B. 1988); <u>West Corp. v. McKee Foods Corp.</u>, 53 U.S.P.Q. 2d 1910, 1913 (T.T.A.B. 2000) ("[s]imilarity in either form, spelling or sound alone may be sufficient to support a finding of likelihood of confusion").

More fundamentally, the Board simply <u>assumed</u> that Defendant's word mark would have no connotation associated with Plaintiff's performances, which is precisely the question to be answered under the entire multi-factor likelihood of confusion analysis.  In other words, while ostensibly asking a number of questions to determine whether a consumer seeing Defendant's mark would perceive a connection with Plaintiff, the Board just assumed, in answering one of those questions, that the answer was no.  Moreover, it has long been settled law that any doubt as to the confusing similarity of two marks must be resolved in favor of the senior user, here Plaintiff.  <u>Planters Nut & Chocolate Co. v. Crown Nut Co.</u>, 305 F.2d 916, 923 (C.C.P.A. 1962) (doubt as to likelihood of confusion must be resolved in favor of senior user and against newcomer in field). The Board's legal conclusion as to the similarity of the marks was erroneous, and should be reversed.

27

C.    <u>The Fact that the Parties' Goods and Services are Complementary Favors a Finding of Likely Confusion</u>

Defendant's products and services are complementary to the goods and services offered by Plaintiff under the BLUE MAN GROUP Mark.  Defendant applied to register its mark for "tobacco; smokers' articles, namely, cigarettes."  These goods are complementary to the Plaintiff's goods and services.  <u>See</u> <u>Charrette Corp. v. Bowater Communication Papers Inc.</u>, 13 U.S.P.Q.2d 2040, 2042 (T.T.A.B. 1989) ("[i]t is not necessary that the goods or services on or in connection with which the marks are used be identical or even competitive.  It is enough if there is a relationship between them <u>such that persons encountering them under their respective marks are likely to assume that they originate at the same source or that there is some association between their sources</u>")(emphasis added).[16]  In this regard, consumer perception is the key to likelihood of confusion.  <u>See</u> 4 McCarthy, <u>supra</u> §24:19, at 24-38 to -39 ("In determining possible expansion of a product line, it is the ordinary customer's <u>perception</u> of possible expansion that counts, whether that perception comports with the reality of the senior user's actual plans or not.") (emphasis added).

Here, because Plaintiff itself markets a wide range of products such as gift items, clothing and paper goods, and even features cigarette lighters as the focus of a segment in its recent touring production "The Complex" (Goldman Aff at ¶ 9), the likelihood of confusion is exacerbated and less similarity between marks will be tolerated.  <u>See</u> <u>National Football League</u>

---

[16]    Indeed, the fact that a given consumer might never encounter Plaintiff's products and services and Defendant's services in the same retail location, and thus not be able to make a side-by-side comparison, could <u>increase</u> the likelihood of confusion.  <u>See</u> <u>Faberge, Inc. v. Madison Shirt Corp.</u>, 192 U.S.P.Q. 223, 227 (T.T.A.B. 1976) (resemblance of BRUTUS for men's shirts to BRUT for men's toiletries, "when considered in light of a purchaser's general recollection or imperfect recall of marks and the absence of a situation whereby side-by-side comparisons of the marks would be readily available," was likely to cause confusion).

v. Jasper Alliance Corp., 16 U.S.P.Q.2d 1212, 1215-16 (T.T.A.B. 1990) (wide scope of
protection given to opposer, who uses mark SUPER BOWL on wide range of merchandise).

      The most compelling evidence of the perceived relatedness of the parties' products,
however, is actual consumer confusion as to a connection between BLUE MAN GROUP and
cigarettes.  As noted above at Section 1 (STATEMENT OF THE CASE), such confusion has
already occurred, as documented by the unsolicited email communication received by
Plaintiff, annexed as Exhibit C to the Goldman Declaration. This communication from a
consumer leaves no doubt that a reasonable person encountering the mark BLUEMAN on a
package of cigarettes would be "likely to assume that they originate at the same source [as
BLUE MAN GROUP] or that there is some association between their sources."  Charette, 13
U.S.P.Q.2d, supra. Further, this consumer was not credulous or uneducated, but had
previously attended an authorized BLUE MAN GROUP performance in New York. Still,
confusion as to the connection between Plaintiff and cigarettes resulted.

      Further, in view of the unusually large range of products and services with which
Plaintiff's BLUE MAN GROUP Mark has been associated, notably including Plaintiff's own
branded products and licensed third-party uses in connection with Intel computer chips and
Swatch wristwatches, it takes no leap of logic to conclude that persons encountering
Defendant's BLUEMAN cigarettes would be familiar with Plaintiff's BLUE MAN GROUP
mark and would be likely to believe, erroneously, that such products are also endorsed or
sponsored by Plaintiff.  See McDonald's Corp. v. McClaine, 37 U.S.P.Q.2d 1274, 1276
(T.T.A.B. 1995) (in view of McDonald's history of licensing, persons likely to conclude that
McDonald's is connected with Defendant's legal services in some way, if not directly then by
authorizing or sponsoring the activity); Corp. of Lloyd's of London v. Louis D'Or of France,

_Inc._, 202 U.S.P.Q. 313, 316-17 (T.T.A.B. 1979) (LLOYD'S OF LONDON aftershave likely to cause confusion with LLOYD'S OF LONDON for insurance.)

Moreover, where products travel through the same or related trade channels, confusion is also more likely.  _AMF, Inc. v. Sleekcraft Boats_, 599 F.2d 344, 353 (9th Cir. 1979).  Before the Board, likelihood of confusion must be decided on the basis of the goods or services set forth in the application(s) and registration(s) involved in a proceeding, regardless of the specific nature, uses or channels of trade which may be disclosed by the evidence.  _E.g._, _Bose Corp. v. QSC Audio Prods. Inc._, 293 F.3d 1367, 1377 (Fed. Cir. 2002); _Charrette Corp. v. Bowater Communication Papers Inc._, 13 U.S.P.Q.2d 2040, 2042 (T.T.A.B. 1989); _McDonald's Corp. v. McKinley_, 13 U.S.P.Q.2d 1895, 1898 (T.T.A.B. 1989).  Both the registrations for BMPI's BLUE MAN GROUP mark and the application for Defendant's BLUEMAN mark are unrestricted as to channels of trade; thus, all of the parties' products must be assumed to travel in all of the normal channels of trade for such goods and services.  _E.g._, _Bongrain Int'l (Am.) Corp. v. Moquet Ltd._, 230 U.S.P.Q. 626, 628 (T.T.A.B. 1986); _In re Apparel Ventures, Inc._, 229 U.S.P.Q. 225, 227 (T.T.A.B. 1986).

D.    As the Newcomer, Defendant Had the Obligation to Avoid BMPI's Well-Known Mark

A newcomer to a product area, such as Defendant, has a duty to avoid selecting a mark close to a well-known mark in order to protect the senior user's established goodwill and investment.  Any doubts are resolved in favor of the established mark, here BMPI's Mark.  _See Specialty Brands, Inc. v. Coffee Bean Distribs., Inc._, 748 F.2d 669, 674 (Fed. Cir. 1984) ("When balancing the interest in a famous, established mark against the interests of a newcomer, we are compelled to resolve doubts on this point against the newcomer"); _Hancock_

v. American Steel & Wire Co., 203 F.2d 737, 741 (C.C.P.A. 1953) (any doubt should be resolved in favor of the senior user especially where sales and nationwide goodwill had developed with substantial sales and advertising).

The rationale for placing an obligation on the newcomer is that selection of a dissimilar mark is relatively easy, whereas selection of a close mark suggests an intent to unfairly benefit from the senior user's hard earned reputation.

As noted by the Federal Circuit:

> The law has clearly been well settled for a longer time than this court has been dealing with the problem to the effect that the field from which trademarks can be selected is unlimited, that there is therefore no excuse for even approaching the well-known trademark of a competitor, that to do so raises "but one inference -- that of gaining advantage from the wide reputation established by appellant in the goods bearing its mark," and that all doubt as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous and applied to an inexpensive product bought by all kinds of people without much care.

Specialty Brands, Inc., 748 F.2d at 676 (quoting Planters Nut & Chocolate Co. v. Crown Nut Co., Inc., 305 F.2d 916, 924-25 (C.C.P.A. 1962)). As the newcomer, Defendant did not fulfill his obligation to stay away from BMPI's long-established and well-known BLUE MAN GROUP Mark, and introduced no evidence to demonstrate a justifiable explanation for his adoption, use, and application for federal registration of his confusingly similar BLUEMAN mark.

Given the failure of Defendant as a newcomer to select a mark sufficiently different from BMPI'S existing and well-established BLUE MAN GROUP mark, this factor also supports a finding of likely confusion. In sum, all of the relevant factors favor Plaintiff and the Opposition should be sustained on grounds of likelihood of confusion.

31

## III. THE BOARD ERRED IN FINDING NO DILUTION

A.    <u>Standard for Dilution</u>

The Federal Trademark Dilution Act ("FTDA"), as amended by the Trademark

Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1125 (c)(l)(2006),  provides that the

owner of a famous mark shall be entitled to an injunction against another who

at any time after the owner's mark has become famous, commences use of a mark or trade
name in commerce as a designation of source that is likely to cause dilution by blurring or
dilution by tarnishment of the famous mark, regardless of the presence or absence of actual
or likely confusion, of competition, or of actual economic injury.

15 U.S.C. §  1125(c)(1)

The FTDA (as amended by the TDRA) also provides, under Lanham Act Section

13(a), 15 U.S.C. § 1063(a), the right to oppose registration of a mark by any person who

believes he would be damaged by the registration, "including the registration of any mark

which would be likely to cause dilution by blurring or dilution by tarnishment under

[Lanham Act] section 43(c)."

The TRDA provides a remedy in those situations where the public may well know

that the junior user is not connected to or sponsored by the mark owner, yet the ability of the

owner's mark to serve as a unique identifier of the owner's goods or services is weakened

because the public now also associates that designation with a new and different source. <u>See</u>

§ 1125(c)(2)(B)(definition of "dilution by blurring" as "the association arising from the

similarity between a mark or trade name and a famous mark" that impairs the ability of the

famous mark to distinguish its goods).

32

The protection of the TDRA is available to Plaintiff's BLUE MAN GROUP Mark because the mark is "famous" as defined under the statute. The non-exclusive factors stated in Section 1125(c) that maybe considered in determining the fame of a mark are

> The duration, extent and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;

> The amount, volume and geographic extent of sales of goods or services offered under the mark;

> The extent of actual recognition of the mark;

> Whether the mark was federally registered.

Id.

After consideration of these non-exclusive factors, the court is to conclude that a mark is famous if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). The BLUE MAN GROUP Mark clearly qualifies as "famous" under this definition. It has been advertised extensively and nationwide, in connection with the sale of $1 billion dollars in goods and services, has received extensive nationwide media exposure, and is a registered mark.

Once fame is shown, dilution is established if the marks are at a minimum substantially similar and Defendant's target customers would likely make an association between the parties' products bearing the marks, even if they are not confused as to the different origins of the products. NASDAQ Stock Market Inc. v. Antarctica S.r.l., 69

U.S.P.Q.2d 1718, 1737 (TTAB 2004).[17]  Accordingly, the issue is whether the Defendant's

BLUEMAN mark is so similar to the famous BLUE MAN GROUP mark that Defendant's

customers would immediately make a connection with the BLUE MAN GROUP mark and

associate Defendant's use with Plaintiff, even if they would not believe that the goods

originated with Plaintiff.  NASDAQ, 69 U.S.P.Q.2d at 1737.

      B.    The Plaintiff's Mark is Famous

With respect to the "fame" of Plaintiff's Mark there is substantial evidence, detailed

above and in the Goldman Declaration, from which to conclude that by the relevant date,

August 6, 2001, BLUE MAN GROUP had become "widely recognized by the general

consuming public of the United States as a designation of source of the goods or services of

the mark's owner." 15 U.S.C. § 1125(c)(2)(A).

      1.    The BLUE MAN GROUP Mark Has Been Advertised and Publicized
              Throughout the U.S. Since 1988, Both By Plaintiff and By Third
              Parties

The BLUE MAN GROUP mark has been advertised and publicized continuously and

extensively throughout the country since at least 1988 in connection with Plaintiff's Goods

and Services.  As detailed above, and prior to the relevant date, Plaintiff already had spent

more than $20 million on advertising, and advertisements and publicity for the BLUE MAN

GROUP mark were seen on a regular and repeated basis by millions of Tonight Show

---

17      Even though the NASDAQ decision was issued pursuant to the FTDA, before the
passage of the TDRA, the standard under which the NADSAQ panel found dilution was based
upon a likelihood of dilution.  NASDAQ, 69 U.S.P.Q.2d at 1734.  The TDRA was enacted into
law specifically to overrule the Supreme Court's decision in Moseley v. V. Secret Catalogue,
Inc., 537 U.S. 418 (2003), which held that FTDA dilution claims in civil actions were governed
by the actual dilution standard. HR Rep. No. 109-23 at 5 (2005).  Therefore, the NASDAQ
decision remains as a relevant guide to determine dilution claims before the Trademark Trial and
Appeal Board.

viewers, readers of The New York Times, Time, People, Esquire, GQ, Variety, The Nation, Playboy, Business Week, Theater Week, ARTnews, Vanity Fair, and the Village Voice, and millions of theatergoers throughout the United States.  This factor favors a finding that the mark is famous.

      2.    A Large Amount and Volume of the Plaintiff's Goods and Services Under the BLUE MAN GROUP Mark Have Been Sold Throughout the U.S. Since 1988

By the relevant date, Plaintiff had provided entertainment services, and sold related merchandise, to vast numbers of people throughout the United States.  It had been seen by an estimated 1.5 billion viewers worldwide on the February 2001 Grammy Awards telecast (Goldman Dec. at ¶ 17), as well as in at least eight (8) appearances on The Tonight Show With Jay Leno.  Its 1999 Grammy-nominated sound recording "Audio" was certified as a gold record by the recording industry, having sold more than 500,000 copies.  This factor favors a finding of fame as well.

      3.    There has been extensive recognition of the BLUE MAN GROUP Mark by Others

As noted above, BLUE MAN GROUP has been widely recognized as a famous trademark in public discourse. Plaintiff has been recognized frequently as "a certified pop culture phenomenon" (Exh. A, doc. 314, Panorama at 32, June 11, 2001), a "household name" (Exh. A, doc. 353 Calvin Spark at 17), "world-famous"  (Exh. A, doc. 295, Official City Guide at 68, Dec. 6, 2001), "international celebrities" (Exh. A, doc. 280, New York magazine, Mar. 25, 2002), and "blue icons" (Exh. A, doc. 75, New York Times, Sept. 16, 2001).

21749/003/803289.1

4.    The BLUE MAN GROUP Mark is Federally Registered

Status and title copies of Plaintiff's trademark registrations are attached as Exhibit D to the Goldman Declaration. These documents demonstrate that Plaintiff had obtained two registrations for its BLUE MAN GROUP Mark (No. 2,438,222 registered March 27, 2001 and No. 2,450,660 registered May 15, 2001) before the relevant date of August 6, 2001. Therefore this factor also favors a finding that the BLUE MAN GROUP mark is famous for purposes of the TDRA.

Under each of the four relevant factors, the evidence demonstrates that Plaintiff's efforts have made BLUE MAN GROUP "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A).  It is therefore a famous trademark under the TDRA.

C.    BLUEMAN Dilutes BLUE MAN GROUP

Having established fame, Plaintiff is required to show that the BLUEMAN mark would be likely to cause dilution of the BLUE MAN GROUP Mark by blurring, which the statute defines as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125 (c)(2)(B). There is no question in this case that blurring is likely to occur.

To determine whether dilution by blurring has occurred, the TDRA allows courts to consider "all relevant factors" including:

The degree of similarity between the [accused mark] and the famous mark;

The degree of inherent or acquired distinctiveness of the famous mark;

The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark;

36

The degree of recognition of the famous mark;

Whether the user of the [accused mark] intended to create an association with the famous mark; and

Any actual association between the [accused mark] and the famous mark.

15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

Under the record here, each of these factors favors Plaintiff. As to <u>similarity</u>, the marks need only be sufficiently similar such that the junior mark will conjure up an association with the senior mark in the mind of consumers.   <u>NASDAQ</u>, 69 U.S.P.Q.2d at 1737.

<u>Distinctiveness</u> also weighs in Plaintiff's favor. The Board itself found Plaintiff's mark to be "strong and distinctive". Decision at 1819. With respect to the factor of "acquired distinctiveness", there is substantial evidence, detailed above, on which to conclude that by the relevant date (August 6, 2001) BLUE MAN GROUP had achieved a high degree of recognition in the United States as a trademark of Plaintiff.  <u>See</u> 15 U.S.C. § 1125(c)(2)(B)(ii) – (iv).

In addition, Plaintiff is the <u>exclusive</u> user of the BLUE MAN GROUP mark. To Plaintiff's knowledge, no other entity uses any mark incorporating the terms "BLUE MAN" as a mark in the United States, Goldman Dec. at ¶ 2, and Defendant introduced no evidence of such third-party use.

The <u>recognition</u> factor also weighs in BLUE MAN GROUP's favor. The vast nationwide scale of Plaintiff's activities, and the constant coverage it has received in the general media since prior to Defendant's relevant date, all previously discussed in detail

37

above and in the Goldman Declaration, indicate that BLUE MAN GROUP would have been widely recognized among the general consuming public of the United States.

The factors dealing with Defendant's <u>intent</u> and <u>actual association</u> between the parties' marks are not applicable here. Defendant submitted no evidence in this Court, and submitted none before the Board, so his intent remains unknown. Further, since Defendant introduced no evidence of advertising or sales of his BLUEMAN products in the U.S., there has been no opportunity for any actual mis-association to occur. See <u>supra</u> at note 15.

In sum, all of the relevant statutory factors weigh in favor of a finding that BLUEMAN dilutes the BLUE MAN GROUP Mark. The Court should therefore grant BMPI's motion for a default judgment, reverse the Board and refuse registration of BLUEMAN on the ground of dilution.

## SUMMARY

Plaintiff's famous Mark BLUE MAN GROUP has been continuously and extensively used on or in connection with Plaintiff's Goods and Services since 1988. Plaintiff has gained tremendous goodwill and recognition in the entertainment field, and in connection with ancillary merchandise. Because the undisputed facts of record show that Defendant's BLUEMAN mark is likely to be confused with BMPI's famous and long-established BLUE MAN GROUP Mark, and dilutes the distinctiveness of Plaintiff's famous BLUE MAN GROUP Mark, the Court should enter a default judgment against Defendant in this action, reverse the Decision of the Board in the proceedings below, and remand with instructions to the Board that it sustain the Opposition.

## CONCLUSION

For the foregoing reasons, a default judgment should be granted, the Board's Decision below

should be reversed and the Opposition should be sustained.

Respectfully submitted,

OBLON, SPIVAK, McCLELLAND,
  MAIER & NEUSTADT, P.C.

Dated: September 5, 2007        By:  s/_____
     Alexandria, Virginia            Jonathan Hudis
                          (D.C. Bar No. 418872)
                          Kathleen Cooney-Porter
                          (D.C. Bar No. 434526)
                          1940 Duke Street
                          Alexandria, Virginia 22314
                          (703) 413-3000
                          Fax: (703) 413-2220
                          E-Mail: *jhudis@oblon.com*
                          Attorneys for Plaintiff

                          Robert W. Clarida
                          Antonio Borrelli
                          COWAN, LIEBOWITZ &
                           LATMAN, P.C.
                        1133 Avenue of the Americas
                        New York, New York 10036-6799
                        (212) 790-9200
                        Fax: (212) 575-0671
                         *Of Counsel*

39